1

2

3

4

5

6                         UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON

7                              AT SEATTLE

8 DEVIN MICHAEL RYAN,

9                       Plaintiff,            CASE NO. C19-0753-MJP-MAT

10       v.

11 CORRECTIONAL DEPUTY ADAM         REPORT AND RECOMMENDATION
HANSEN, *et al*.,

12                    Defendants.

13

14                         INTRODUCTION

15      Plaintiff proceeds pro se and *in forma pauperis* with a second amended civil rights

16 complaint under 42 U.S.C. § 1983. (Dkt. 25.) He alleges defendants Snohomish County and

17 Correctional Deputy Adam Hansen violated his Eighth and Fourteenth Amendment rights in an

18 incident occurring during his confinement as a pre-trial detainee at the Snohomish County Jail.

19      Defendants filed a Motion for Summary Judgment. (Dkt. 34.) Plaintiff did not respond to

20 the motion. The Court, having considered the motion and the remainder of the record, recommends

21 defendants' motion be GRANTED in part and DENIED in part.

22                         BACKGROUND

23      The incident at issue in this case occurred on June 2, 2017, in a tunnel connecting the

REPORT AND RECOMMENDATION
PAGE - 1

Snohomish County Jail and Courthouse, and during the transport of plaintiff and some nineteen other inmates by several correctional deputies. (*See* Dkt. 25 (Second Amended Complaint) and Dkt. 35 (Declaration of Adam Hansen).) The inmates wore waist shackles during the transport, with their hands secured at the front of their bodies. (*See* Dkt. 32 (Video Surveillance).)

Plaintiff alleges that, during the transport, he verbally objected to the assault of another inmate by Hansen and Correctional Deputy Kenneth Anstett. (Dkt. 25 at 2.) After complying with an order to face the wall, plaintiff again objected. (*Id.* 2-3.) Hansen thereafter rushed to plaintiff and pulled him "backwards off his feet by his waist shackles, dragging him down the hallway." (*Id.* at 3.) After Hansen stopped and slammed plaintiff up against a wall, plaintiff stated: "[You're] a real tough guy huh?" (*Id.*) Hansen threw plaintiff to the floor and slammed his knee into plaintiff's lower back, causing plaintiff to scream in pain. (*Id.*)

Hanson asserts Anstett took an inmate to the ground during the transport for security reasons, and that he took control of the inmate's legs while they waited for additional assistance to arrive. (Dkt. 35, ¶2.) During this time, plaintiff was talking, shouting, and inciting other inmates, and failed to comply with verbal commands to stop. (*Id.*) Hansen removed plaintiff from the line of inmates by "grabbing him by the arm and shirt." (*Id.*) Plaintiff continued to "yell, talk, and agitate" and Hansen pinned plaintiff against the wall with his hip and called for backup with his radio. (*Id.*, ¶3.) Immediately after the call, Hansen felt plaintiff "push off the wall and move his head." (*Id.*) Hansen asserts he was aware of plaintiff's history of disobedient and disruptive behavior at the jail and feared plaintiff might attempt to head butt him or spin away from his grasp. Hansen took plaintiff to the ground, using his hip to unbalance plaintiff and his grasp of plaintiff's upper body to control the fall. Hansen believed the ground would be the safest spot for himself, plaintiff, and others, by preventing plaintiff from using his legs to kick or strike, immobilizing his

torso so that he could not twist out of the hold, and preventing him from head butting, escaping, or falling. (*Id.*, ¶¶3, 5.) He maintains he used the lowest amount of force necessary to gain compliance and secure the safety of everyone involved. (*Id.*, ¶5.) Hansen held plaintiff to the ground until backup arrived and plaintiff was taken back to the jail. (*Id.*, ¶3.)

Plaintiff provides with his complaint copies of his related grievances (Dkt. 25, Ex. H, at 34-35, 37-41), an investigation into the incident (*id.*, Ex. C, at 16-24; *see also* Exs. D-G (incident and supplemental witness reports), and an administrative review of the investigation (*id.*, Ex. J). The investigating officer, Corrections Sergeant Michael Ball, stated Hansen's decision to move plaintiff away from other inmates in the tunnel could be seen as reasonable based on plaintiff being loud and vocal. (*Id.*, Ex. C, at 21.) Sergeant Ball also had no issue with the "take-down" itself, describing it as "controlled and not malicious", but concluded there did not "appear to be any valid reason" for the take-down to occur other than plaintiff "being vocal." (*Id.* at 20-21.) Among other considerations, Sergeant Ball did not find video footage to support any resistance on the part of plaintiff prior to the take-down or any basis for Hansen's expression of concern plaintiff could have tried to grab a weapon. (*Id.*) Sergeant Ball's report also reflects Hansen's contention plaintiff resisted the move from the other inmates by grabbing onto the handrail, and that Deputy Downing, who had been standing within arms-length of plaintiff, confirmed plaintiff was yelling, "but didn't present a threat[]" and was "unsure" why Hansen found it necessary to move plaintiff. (*Id.* at 18-20; *see also id.* at 18 (Deputy Miller "didn't know what prompted C/D Hansen to remove the inmate from the line other than maybe because he was shouting . . . ").) Sergeant Ball found a violation of the use of force policy sustained, deemed Hansen's culpability for the violation reckless, rather than negligent or intentional, and recommended a verbal reprimand. (*Id.* at 22.) The "Command Concurrence" portion of the investigation revealed both concurring and non-

REPORT AND RECOMMENDATION
PAGE - 3

1   concurring opinions as to Sergeant Ball's findings and recommendation, as well as one opinion

2   concurring with his findings, but recommending a three-year written reprimand.  (*Id*. at 23.)

3       In the administrative review, Corrections Major Jamie Kane described his non-concurring

4   opinion.  Major Kane stated:  "'Being vocal <u>is</u> a level of resistance in and of itself as outlined in

5   the use of force continuum contained in policy 10.0.2, *Use of Force*."  (*Id*., Ex. J, at 44 (emphasis

6   in original).)  Considering the "verbal resistance", all of the "environmental factors at the time of

7   the event," and the fact Hansen could have used a "counter joint pain compliance technique" which

8   would have likely resulted in increased physical resistance and further escalation, Kane found the

9   decision to take plaintiff to the ground until back-up arrived "justified, reasonable, lawful, and

10  within policy." (*Id*. at 45.)  He recommended a finding of non-sustained/cleared and no discipline.

11      Defendants provide both Hansen's June 2, 2017 incident report and the jail's video

12  surveillance footage of the incident.  (Dkt. 35, Ex. A. & Dkt. 32.)  In the incident report, Hansen

13  states plaintiff "attempted to hold onto the handrail to prevent his movement" away from the wall

14  and that plaintiff "continued to incite other inmates" and resist Hansen's movement after removal

15  to a more secure area.  (Dkt. 35, Ex. A.)  The video lacks audio and begins sometime after Anstett

16  has taken an inmate to the ground and ends shortly after plaintiff has been led back to the jail.  The

17  video shows, *inter alia*, plaintiff talking after the inmates have been told to face the wall; Hansen

18  removing plaintiff from the wall, with one arm around plaintiff's arm and another at plaintiff's

19  back, and plaintiff holding paperwork in his hands at his front; Hansen walking plaintiff to the end

20  of the tunnel and using his body to pin plaintiff against the wall while he used his radio; and,

21  immediately after the call, Hansen taking plaintiff to the ground, using his body to take plaintiff

22  off balance and turn plaintiff face down on the ground, crossing plaintiff's legs, and holding him

23  on the ground, with one knee on plaintiff's back and the other on plaintiff's legs.  (Dkt. 32.)

REPORT AND RECOMMENDATION
PAGE - 4

Plaintiff alleges a jail medical provider who saw him shortly after the incident "could find no injuries but did not perform any medical [tests] such as MRI, CAT scan, motions tests, etc." (Dkt. 25 at 3.) He submits a September 1, 2017 memorandum from Dr. Stuart Andrews, who first saw plaintiff on the day of the incident and found "areas of tenderness, but no induration [swelling] or bruising[,]" and "mildly reduced" neck and back range of motion. (*Id.*, Ex. L, at 51.) In subsequent visits, plaintiff reported persisting low back and neck pain and minimal range of motion. Dr. Andrews stated: "X-rays of the neck and upper and lower back are normal. He has no radiation of pain into any extremity, and reflexes are normal." (*Id.*) Dr. Andrews contrasted daily observations from jail nurses that plaintiff "moves fluidly and without hesitation or apparent pain[,]" with his clinic visits showing him "hunched over, wincing, and displaying a slow, guarded gait[.]" (*Id.*) On his cervical spine x-ray, plaintiff "could not flex or extend the neck more than 1 or 2 degrees, as opposed to the 20 to 40 degrees excursions on 6/2/17, when he should have been at his worst." (*Id.*) Based on plaintiff's "observed, paradoxical movements, the absence of bruising or swelling initially, his films, his neurological exam, and his lack of neurological signs or symptoms," Dr. Andrews did not believe there was a need for either further imaging studies or a second opinion. (*Id.*)

Plaintiff also provides a document summarizing an October 16, 2017 visit with outside provider Dr. Andrew Chrisman. (Dkt. 25, Ex. A) Dr. Chrisman describes the issues addressed as CVA tenderness, chronic bilateral low back pain with sciatica, sciatic laterality unspecified, and lumbar radicular pain. The summary does not contain any findings from examination or testing, but includes recommendations for use of a non-steroidal anti-inflammatory drug, such as Ibuprofen or Naproxen, Acetaminophen (Tylenol), ice, and a recumbent bike, and lists plaintiff's medications as including Hydrocodone-Acetaminophen, Naproxen, and Nortriptyline. Dr. Stuart also indicates

he ordered an MRI and ultrasound, but plaintiff does not provide any further documentation associated with such imaging or other medical treatment.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The moving party bears the initial burden of showing the district court an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden of proof. *Id.* at 322-23, 325. The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). A mere scintilla of evidence does not suffice to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party rely on allegations in the complaint or unsupported conjecture or conclusory statements. *Hernandez v.*

1    *Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

2        Plaintiff did not oppose the motion for summary judgment.  However, because the Court

3    has an affirmative duty to determine whether defendants are entitled to a judgment as a matter of

4    law, the Court assesses the substance of plaintiff's claims. *Martinez v. Stanford*, 323 F.3d 1178,

5    1182-83 (9th Cir. 2003).

6                                    DISCUSSION

7        Plaintiff here avers defendant Hansen's deliberate indifference to his safety constituted a

8    due process violation under the Fourteenth Amendment and cruel and unusual punishment under

9    the Eighth Amendment.  He seeks to hold defendant Snohomish County liable for the failure to

10   oversee the implementation and enforcement of policies, procedures, and regulations and the

11   training and supervision of employees, leading to multiple instances of excessive force.  He

12   contends he has been and continues to be irreparably injured by the conduct alleged and seeks

13   declaratory and injunctive relief, as well as compensatory and punitive damages.

14       To sustain a § 1983 civil rights claim, plaintiff must show (1) he suffered a violation of

15   rights protected by the Constitution or created by federal statute, and (2) the violation was

16   proximately caused by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48

17   (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  For the reasons discussed below,

18   the Court finds defendants entitled to summary judgment only in part.

19   A.   Excessive Force

20       While the Eighth Amendment prohibits the cruel and unusual punishment of prisoners, *Bell*

21   *v. Wolfish*, 441 U.S. 520, 535 (1979), the Fourteenth Amendment's Due Process Clause protects

22   pretrial detainees from excessive force, *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466,

23   2470, 192 L. Ed. 2d 416 (2015).  *See also Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause,

REPORT AND RECOMMENDATION
PAGE - 7

1    a detainee may not be punished prior to an adjudication of guilt in accordance with due process of

2    law.")  As observed by defendants, while raising his claim under both the Eighth and Fourteenth

3    Amendments, only the Fourteenth Amendment applies given plaintiff's status as a pretrial detainee

4    at the time of the incident in question.  Plaintiff's claim under the Eighth Amendment is therefore

5    subject to dismissal as a matter of law and the Court herein reviews the claim of excessive force

6    under the Fourteenth Amendment.

7        The test for identifying unconstitutional punishment at the pretrial stage of a criminal

8    proceeding requires a court to examine "whether there was an express intent to punish, or 'whether

9    an alternative purpose to which [the restriction] may rationally be connected is assignable for it,

10   and whether it appears excessive in relation to the alternative purposes assigned [to it].'"  *Demery*

11   *v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538).  A pretrial detainee

12   may, in the absence of an expressed intent to punish, "nevertheless prevail by showing that the

13   actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the

14   actions 'appear excessive in relation to that purpose.'"  *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*,

15   441 U.S. at 561).

16       To prevail on an excessive force claim, "a pretrial detainee must show only that the force

17   purposely or knowingly used against him was objectively unreasonable."  *Id*.  "[O]bjective

18   reasonableness turns on the 'facts and circumstances of each particular case,'" without regard to

19   the officers' underlying intent or motivation. *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396

20   (1989)).  A pretrial detainee must demonstrate a defendant's acts or omissions were objectively

21   unreasonable, and identify objective facts indicating the "challenged governmental action is not

22   rationally related to a legitimate governmental objective, or that it is excessive in relation to that

23   [objective]."  *Id*. at 2473-74.

REPORT AND RECOMMENDATION
PAGE - 8

The Court must weigh the circumstances from the viewpoint of a reasonable officer at the scene and "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id*. (internal quotation and citation omitted). The non-exclusive list of factors potentially relevant to the assessment of reasonableness include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. at 2473 (citing *Graham*, 490 U.S. at 396).

The Supreme Court has recognized that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546. The Supreme Court has further recognized that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547. Further, the "'safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face,'" and "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Kingsley*, 135 S. Ct. at 2474 (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012), and *Graham*, 490 U.S. at 397).

The incident in this case involved the transport of some nineteen inmates, wearing waist

REPORT AND RECOMMENDATION
PAGE - 9

shackles, through a tunnel by some five correctional deputies.  There is no dispute plaintiff verbally objected while another inmate was being held on the ground by two correctional deputies and that he continued to object after he and other inmates had been directed to face the wall.  There is nothing in the complaint disputing defendants' contention plaintiff was repeatedly told to stop being vocal.  The surveillance video provides confirmation plaintiff continued to speak after moving to the wall and shows Hansen thereafter removed plaintiff from the wall and walked him to the end of the tunnel in a firm, but controlled manner.  Plaintiff again spoke out after Hansen pinned him to the wall and the video depicts an abrupt, controlled take-down of plaintiff to the floor immediately after Hansen radioed for help.

Hansen attests he removed plaintiff from the wall and moved him down the corridor given his fear plaintiff would continue to incite other inmates by ignoring commands and being vocal. (Dkt. 35, ¶2.)  He attests he moved plaintiff to the floor after he felt plaintiff push off the wall and move his head, and with consideration of plaintiff's history of disobedient and disruptive behavior, his fear plaintiff might attempt to head butt him or spin away, and his belief the floor would be the safest option.  (*Id*., ¶3.)  Hansen notes he did not strike plaintiff, use a pain compliance hold, or use a baton, oleoresin capsicum spray, or a Taser.  (*Id*., ¶5.)  He states the take-down was only one level of force above "verbal force" and was appropriate given plaintiff's failure to listen to repeated verbal commands.  (*Id*., ¶6.)

Defendants argue that, considering the circumstances of correctional deputies outnumbered by inmates in a confined space, plaintiff's history, plaintiff's yelling and inciting of a group of inmates, and the failure of verbal reprimands, Hansen's controlled take-down was both reasonable and proportionate.  They note jail staff found no injury.  They argue the take-down was not malicious or intended to punish, was designed to ensure safety in a tunnel during a moment of

REPORT AND RECOMMENDATION
PAGE - 10

heightened tension, and that, in utilizing the next level of force above the failed verbal correction, the take-down was not excessive in relation to the penological interest in maintaining the safe and orderly transport of inmates to court.

Defendants also, in their argument, repeat the assertion in the incident report and investigation that plaintiff resisted being moved away from the line of inmates by grabbing onto the handrail. (*See* Dkt. 34 at 9; Dkt. 25 at 19, 32.)  Yet, Hansen does not attest to such resistance in his declaration.  (*See* Dkt. 35).  In addition, while Hansen does attest to feeling plaintiff push off the wall and move his head prior to the take-down (*id*, ¶3), Sergeant Ball's investigation and the video surveillance footage detract from that contention (*see* Dkt. 25, Exs. C-J; Dkt. 32).  Specifically, and as found by Sergeant Ball, the video does not reveal active physical resistance on plaintiff's part, either before or after Hansen moves him to the end of the tunnel.  The investigation further reflects Deputy Downing, who had been standing close to plaintiff at the wall, did not perceive plaintiff as presenting a threat and was unsure why Hansen found it necessary to move plaintiff.  (Dkt. 25, Ex. C, at 18.)  The evidence also shows disagreement with the investigation findings and recommendation, with one individual finding a more serious reprimand warranted and another finding plaintiff's verbal resistance alone to warrant all corrective action taken by Hansen.

In sum, while the evidence supports a finding of attempt to temper the use of force through verbal reprimands, it also reveals disputed facts and outstanding issues on other factors relevant to determining whether Hansen's actions were objectively reasonable.  Those issues include the necessity of plaintiff's removal and the take-down, the severity of the security problem, the threat reasonably perceived by Hansen, and the existence of active resistance.  With respect to the remaining factor, extent of injury, the evidence is minimal and unclear.  (*See* Dkt. 25, Ex. L, at 51

1  (Dr. Andrews found minimal to no findings on examination, described x-rays as normal, and raised

2  questions as to the veracity of plaintiff's reporting given inconsistencies in his appearance and

3  presentation), and Ex. A (Dr. Chrisman ordered further imaging, did not clarify whether "issues"

4  identified reflected diagnoses or plaintiff's reports, did not include any examination findings or

5  testing results, and recommended conservative treatment).) Considering all relevant factors and

6  the circumstances as a whole, the Court does not find defendant Hansen entitled to summary

7  judgment on the claim of excessive force.

8  B.    Qualified Immunity

9        Defendants also assert Hansen's entitlement to qualified immunity.  Under the doctrine of

10  qualified immunity, state officials "performing discretionary functions [are protected] from

11  liability for civil damages insofar as their conduct does not violate clearly established statutory or

12  constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457

13  U.S. 800, 818 (1982).  In determining whether qualified immunity applies, the Court considers

14  whether the plaintiff alleged sufficient facts to make out a violation of a constitutional right, and

15  whether the constitutional right was clearly established at the time of the alleged violation. *Saucier*

16  *v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009)

17  (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer

18  be regarded as mandatory").

19        "'If the right was not clearly established at the time of the violation, the official is entitled

20  to qualified immunity.'"  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011)

21  (quoted and cited sources omitted)).  In considering whether a right is clearly established, "[t]he

22  contours of the right must be sufficiently clear that a reasonable official would understand that

23  what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The court applies an objective standard; "the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant." *Clairmont*, 632 F.3d at 1109 (internal quotation marks and quoted source omitted). An official who makes a reasonable mistake as to what the law requires is entitled to immunity. *See Saucier*, 533 U.S. at 295; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).

Defendants assert Hansen's entitlement to qualified immunity because his actions, including the grabbing and holding and the take-down, did not violate a clearly established right and because the constitutional right allegedly violated was not clearly established at the time of the incident. They point to *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582, 201 L. Ed. 2d 295 (2018), as an analogous case. In *Shafer*, the Ninth Circuit found a police officer entitled to qualified immunity because, at the time of the incident, the law was not clearly established that "an officer cannot progressively increase his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver when a misdemeanant refuses to comply with the officer's orders and resists, obstructs, or delays the officer in his lawful performance of duties such that the officer has probable cause to arrest him in a challenging environment." *Shafer*, 868 F.3d at 1113, 1117.

The Court, however, finds *Shafer* distinguishable in at least one critical respect. In *Shafer*, a jury found the officer had probable cause to arrest where the misdemeanant not only refused to comply with an order, but also resisted, obstructed, or delayed the officer in performing his duties. *See, e.g., id*. at 1116-17 ("As to whether Shafer was actively resisting arrest or attempting to evade arrest by flight, the jury's verdict on probable cause to arrest . . . makes clear that Shafer willfully resisted, obstructed, or delayed Deputy Padilla during his execution of Shafer's arrest.") Other than the misdemeanant's denial, the evidence he had resisted was generally consistent. *See id*. at

REPORT AND RECOMMENDATION
PAGE - 13

1113-14.  In this case, plaintiff both denies and provides evidence supporting his contention that, while he was verbal, he did not resist.  Considering this distinction, as well as the disputes of fact on the claim of excessive force, the Court does not find defendant entitled to qualified immunity.

C.    Municipal Liability

To establish municipal liability, a plaintiff must show a "policy or custom" led to the plaintiff's injury.  *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor.  *Id.* at 691-94.  Liability must rest on the actions of the municipality, not on the actions of an employee.  *Bd. of the Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 403 (1997).  Municipal liability must, moreover, reflect "deliberate indifference" to a constitutional right, *City of Canton v. Harris*, 489 U.S. 378, 392 (1989), and entails an objective inquiry, *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (citing Supreme Court's understanding that an objective standard necessarily applies to municipalities "for the practical reason that government entities, unlike individuals, do not themselves have states of mind[.]")  A municipal liability claim may involve implementation of official polices or established customs inflicting the injury, omissions or failures to act amounting to a policy of deliberate indifference, or ratification of a subordinate's unconstitutional conduct by an official with final policy-making authority.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), *overruled in part on other grounds in Castro*, 833 F.3d at 1070.

Policies of omission, such as inadequate training, can be "policies" or "customs" that create municipal liability under *Monell*, but only if the omission "reflects a 'deliberate' or 'conscious' choice" to countenance the possibility of a constitutional violation.  *City of Canton*, 489 U.S. at 389-390.  The need to remedy the omission "is so obvious, and the inadequacy so likely to result

REPORT AND RECOMMENDATION
PAGE - 14

1    in the violation of constitutional rights, . . . the policymakers of the city can reasonably be said to

2    have been deliberately indifferent to the need." *Id*.  In other words, the plaintiff must show that

3    the entity "was on actual or constructive notice that its omission would likely result in a

4    constitutional violation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012).  "[A]

5    pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to

6    demonstrate deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 62 (2009) (quoting *Bd.*

7    *of Comm'rs of Bryan Cty*., 520 U.S. at 409).  While there is a "'narrow range of circumstances'"

8    in which a pattern may not be necessary, it is reserved for scenarios in which the "unconstitutional

9    consequences" of the failure to train are so "patently obvious" the municipality could be found

10   deliberately indifferent, such as municipal employees put into service with an "utter lack of ability

11   to cope with constitutional situations[.]" *Id*. at 62-63 (quoting *Bd. of Comm'rs of Bryan Cty*., 520

12   U.S. at 409, and citing *Canton*, 489 U.S. at 391-92).

13          Plaintiff seeks to hold Snohomish County liable for failures in oversight, management,

14   supervision, and training leading to multiple instances of excessive force.  He also appears to

15   phrase this allegation as a "failure to protect" or "negligent failure to protect" him from harm by

16   Hansen.  (Dkt. 25 at 5.)[1]  In supporting his claim for municipal liability, plaintiff points to the

17   alleged incidents of excessive force on himself and another inmate on June 2, 2017 and an alleged

18   incident some two-to-three months later resulting in an inmate's death.  (*Id*. at 4.)[2]

19          Plaintiff fails to set forth evidence supporting an allegation the County should have known

20   its failure of oversight, management, supervision, and/or training would lead to constitutional

21

22          _____

              [1] Plaintiff does not name an individual defendant associated with a separate failure to protect claim.

23            [2] Plaintiff also includes a declaration from another inmate with his complaint.  (Dkt. 25, Ex. N.)
       However, the declaration addresses medical issues and care, not excessive force.

REPORT AND RECOMMENDATION
PAGE - 15

violations.  He provides no evidence associated with either the other inmate subject to a take-down in June 2017 or the alleged later incident involving another unnamed inmate.  A reliance on "random acts or isolated incidents" does not suffice to establish municipal liability.  *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).  Nor does plaintiff set forth circumstances reflecting unconstitutional consequences so patently obvious deliberate indifference could be found.  In addition, to the extent plaintiff alleges mere negligence, such an allegation does not provide for the deliberate indifference required to establish municipal liability.

Plaintiff's allegation of a constitutional violation based on a municipal policy or custom is, in sum, vague, insufficiently supported, and no more than conclusory.  Defendants are entitled to summary judgment and dismissal of claims against Snohomish County.

## CONCLUSION

Defendants do not establish their entitlement to summary judgment and dismissal of the claim of excessive force against Hansen, but the claim against Snohomish County is properly dismissed on summary judgment.  Defendants' Motion for Summary Judgment (Dkt. 34) should be GRANTED in part and DENIED in part, and plaintiff's claims against defendant Snohomish County should be DISMISSED.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be

REPORT AND RECOMMENDATION
PAGE - 16

ready for consideration by the District Judge on **May 22, 2020**.

DATED this 29th day of April, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 17